UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
BANK OF NEW YORK MELLON TRUST CO., : 10 Civ. 9420 (RMB) (JCF)
NATIONAL ASSOCIATION, solely as    :
Trustee under that certain         :        REPORT AND
Indenture dated September 1, 1999  :     RECOMMENDATION
and amendments thereto,            :
                                   :
              Plaintiff,           :
                                   :
      - against -                  :
                                   :
SANTANDER HOLDINGS USA, INC.,      :
                                   :
              Defendant.           :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RICHARD M. BERMAN, U.S.D.J.:

        After summary judgment was granted in favor of trustee Bank of

New York Mellon Trust Co., National Association ("Bank of New York"

or the "Trustee") in this breach of contract action against

Santander Holdings USA, Inc. ("Santander"), the case was referred

to me to determine Bank of New York's damages.  I recommend Bank of

New York be awarded damages in the amount of $305,626,022.00, costs

and attorneys' fees in the amount of $3,160,012.31, and accrued

prejudgment interest on the unpaid fees and costs in the amount of

$130,150.23.

Background

        Familiarity with the underlying facts from the order granting

the plaintiff's motion for summary judgment and denying Santander's

motion for summary judgment is assumed.  (Decision and Order dated

Dec. 13, 2011 ("Summary Judgment Order")).  However, because this

opinion deals with fairly complex securities, called Trust

Preferred Income Equity Redeemable Securities ("Trust PIERS"), some

additional background is useful.  Trust preferred securities are generally created by a parent company establishing a wholly-owned subsidiary trust known as a special purpose vehicle, which issues preferred securities that are "convertible into the common stock of the parent company according to pre-specified conversion terms." (Expert Report of John J. McConnell, Ph.D., undated ("McConnell Report"), attached as Exh. 2 to Declaration of David B. Hennes ("Hennes Decl.") dated March 15, 2012, ¶ 21; New Oak Solutions Report & Analysis dated April 16, 2012 ("Spector Report"), attached as Exh. 2 to Sealed Declaration of Sean M. Farrell dated April 16, 2012 ("Sealed Farrell Decl."), ¶ 33).  The funds generated by the issuance of the preferred stock are used by the trust to purchase its sole asset: debt securities, such as subordinated debentures, issued by the parent company.  (Spector Report, ¶¶ 33-34).  "The terms of the trust preferred securities are created to have [] payment terms such that the interest paid by the parent company to the trust on the debt securities can be used to fund the payment obligations of the trust to the trust preferred investors." (Spector Report, ¶ 34).  Typically, there is a deferral period of at least five years on the payment of interest to the trust preferred investors.  (Spector Report, ¶ 35).

The operation of these securities is governed by three agreements.  The trust agreement "defines the terms of the trust preferred securities"; the indenture "governs the terms of the subordinated debt held by the trust," which "mirror" the payment terms of the trust preferred securities; and the guarantee

2

agreement guarantees payment to the trust preferred investors by the parent if "the trust fails to pay all interest due to the trust preferred investors by the maturity date." (Spector Report, ¶ 37).

In this case, Bank of New York is the trustee for certain subordinated debentures originally issued by Sovereign Bancorp, Inc. ("Sovereign") and owned by a Delaware statutory trust (the "Trust"). (Summary Judgment Order at 1; Plaintiff The Bank of New York Mellon Trust Company, N.A.'s Damages Application ("Pl. Memo.") at 3; Defendant Santander Holdings USA, Inc.'s Memorandum of Law in Opposition to The Bank of New York Mellon Trust Company, National Association's Damages Application ("Def. Memo.") at 1; Def. Memo. Glossary[1] at 2). The debentures were issued pursuant to an indenture between Sovereign and Bank of New York's predecessor, Harris Trust and Savings Bank. (Def. Memo. at 1; Indenture dated Sept. 1, 1999 ("Base Indenture"), excerpts attached as Exh. 3 to Hennes Decl. and as Exh. 16 to Declaration of Sean Farrell dated April 16, 2012 ("Farrell Decl.")). The Trust issued to its beneficiaries the Trust PIERS at issue, which are linked to the debentures. (Def. Memo. at 1-2; Def. Memo. Glossary at 2).

Under the governing documents (which include supplements and amendments to the Base Indenture and to the declaration of trust), holders of the Trust PIERS are entitled to quarterly distributions at the rate of 4.375% per year on the liquidation amount of $50 per Trust PIERS. (Amended and Restated Declaration of Trust dated Feb.

---

[1] The first pages of the Defendant's Memorandum comprise a separately-paginated glossary of terms.

26, 2004 ("Am. Trust Decl."), attached as Exh. 5 to Hennes Decl.,
§ 6.01(a), Annex I, § 2(a); Third Supplemental Indenture dated Feb.
26, 2004 ("3d Supp. Indenture"), attached as Exh. 4 to Hennes
Decl., § 2.04(a)).  However, in the event of a "Change of Control"
over Sovereign -- which is defined in the agreements and includes
such occurrences as an investor's acquisition of 50% or more of the
voting power of all of Sovereign's shares or the merger of
Sovereign with or into another entity, subject to certain
exceptions -- the distribution rate on the Trust PIERS will be
reset to

> the greater of (i) 7.410% per annum and (ii) the rate
> determined by a reference agent selected by Sovereign
> Bancorp, Inc. (The "Sponsor") as the market yield at that
> time for a non-convertible trust preferred security
> representing subordinated debt of the surviving entity
> with substantially the same terms and conditions as the
> Trust PIERS will have after the Change of Control, other
> than (x) the terms and conditions set out in Section
> 4(e)(i)(A) and Section 4(e)(ii) of these terms allowing
> for redemption following a Change of Control and (y) the
> terms and conditions set out in Section 2(c) with respect
> to the payment of Contingent Distributions.

(Am. Trust Decl., Annex I, § 2(g)).  Section 4(e)(i)(A) and
4(e)(ii) of Annex I of the Amended Trust Declaration -- the
exclusions set out in subsection (x) -- are redemption rights
triggered by either a Change of Control or a Third-Party Change of
Control (which is defined in the agreements and did not occur in
this case).  Specifically, Section 4(e)(i)(A) allows the Sponsor to
redeem the Trust PIERS "at any time during the thirty days
beginning on the ninetieth day after the occurrence of [a] Change
of Control"; Section 4(e)(ii) gives the Sponsor an immediate
redemption right upon a Third Party Change of Control.  (Am. Trust

4

Decl., Annex I, §§ 4(e)(i)(A), 4(e)(ii)).  Section 2(c) of Annex I of the Amended Trust Declaration, which is excluded pursuant to subsection (y), provides for the periodic payment of contingent distributions when certain conditions are met.  (Am. Trust Decl., Annex I, § 2(c)).

Similarly, upon a Change of Control, the coupon rate on the debentures would be reset to the new distribution rate using a similar process.  (3d Supp. Indenture, § 2.04(h)).[2]

---

[2] The parties tend to treat Section 2(g) of Annex I of the Amended Trust Declaration (governing the Trust PIERS' distribution rate) and Section 2.04(h) of the Third Supplemental Indenture (governing the debentures' coupon rate) as interchangeable. However, the two provisions have materially different texts. Section 2.04(h) states:

> In the event of a Change of Control, the Coupon Rate will be reset equal to the "Reset Rate" on the Trust PIERS, which will be the greater of (i) 7.410% per annum and (ii) the rate determined by a reference agent selected by the Company [defined as Sovereign Bancorp, Inc.] as the market yield at that time for a non-convertible trust preferred security representing subordinated debt of the surviving entity with substantially the same terms and conditions as the Trust PIERS will have after the Change of Control, other than (x) <u>the terms and condition set out in Section 4(e)(i) of Annex I to the Declaration allowing for immediate redemption on a Third-Party Change of Control</u> and (y) the terms and conditions set out in Section 2(c) [] with respect to the payment of Contingent Distributions.

(3d Supp. Indenture, § 2.04(h) (emphasis added)).  Section 4(e)(i) includes, along with the 30 to 120 day redemption right, a redemption right that begins five years after the Change of Control.  (Am. Trust Decl., Annex I, § 4(e)(i)(B)).  Thus, it appears that the Third Supplemental Indenture outlines a process for determining the reset rate that carves out not only the 30 to 120 day redemption right, but also the fifth-year redemption right. However, subsection (x) of Section 2.04(h) of the Third Supplemental Indenture identifies this carve-out as relating to "immediate redemption on a Third-Party Change of Control."  Section 4(e)(i) of the Amended Trust Declaration does not mention a right of immediate redemption or a Third-Party Change of Control;

In the Summary Judgment Order, Judge Berman held that the January 30, 2009 merger in which Santander's parent, Banco Santander, acquired the remaining 75.65% of common stock of Sovereign that it did not yet own and merged Sovereign with and into Santander, constituted a Change of Control under the governing agreements. (Summary Judgment Order at 3-4, 6; Pl. Memo. at 1; Def. Memo. at 2). Because Santander did not declare a Change of Control and reset the relevant rates, Judge Berman held that it had breached the agreements, and thereafter referred the case to me to assess damages against Santander. (Summary Judgment Order at 6, 9).

After a pretrial conference, I issued a scheduling order setting a deadline for discovery and submission of expert reports and briefs on the damages issue. (Order of Jan. 26, 2012 ("January 26 Order")). Both parties timely filed expert reports and briefs. Based on its expert report, Bank of New York argues that the relevant rates should be reset to 13.61% as of January 30, 2009, the date the Change of Control occurred. (Pl. Memo. at 2, 7-15; McConnell Report, ¶¶ 42-61). In addition, Bank of New York contends that it is entitled to unpaid back interest on the outstanding Trust PIERS (Pl. Memo. at 2, 15-16; McConnell Report, ¶¶ 62-65), as well as costs and attorneys' fees pursuant to

---

rather, Section 4(e)(ii) provides that right upon such a control-change. Neither party has pointed to an amendment or rule of construction that would harmonize the texts and neither discusses the difference in the provisions or the possibility of a scrivener's error. I will therefore treat this difference as irrelevant to the resolution of this dispute.

provisions in the Base Indenture and its relevant supplements. (Pl. Memo. at 16-19; Base Indenture, § 607; 3d Supp. Indenture, § 4.01).

In opposition, Santander first argues that, because Bank of New York did not properly disclose its damages evidence or computation, it should be precluded from presenting such evidence, and the relevant rates should be reset to 7.41% -- the minimum reset rate according to the agreements. (Def. Memo. at 4-5). It further finds fault with Bank of New York's submissions, arguing that (1) only a reference agent selected by Santander can determine the reset rate (Def. Memo. at 5-8); (2) any damages calculation must take into account Santander's option, included in the Third Supplemental Indenture, to redeem the Trust PIERS (Def. Memo. at 8-12; 3d Supp. Indenture, § 2.06(c)(i)); and (3) Mr. McConnell is not qualified to opine on the reset rate, and his methodology is inconsistent with the Third Supplemental Indenture (Def. Memo. at 12-16). Indeed, according to Santander's expert, the highest possible reset rate is 8.31%. (Def. Memo. at 16-18; Spector Report, ¶ 126). Finally, Santander asserts that Bank of New York's fee application must be denied because it is insufficient under Second Circuit precedent and inconsistent with the governing agreements. (Def. Memo. at 19-22).

I held an evidentiary hearing on July 16, 2012, at which both Professor McConnell and Mr. Spector testified and were cross-examined. Counsel presented closing arguments on August 21, 2012.

7

Discussion

    A.   <u>Governing Law</u>

The parties agree that this dispute is governed by Pennsylvania law pursuant to the Base Indenture's choice of law provision. (Base Indenture, § 112; Summary Judgment Order at 5).

    B.   <u>Preclusion of Bank of New York's Evidence</u>

Before addressing the merits of Bank of New York's damages application, I must briefly deal with Santander's procedural argument that Bank of New York should be precluded from offering evidence in support of its position on damages because Bank of New York (1) did not make an initial disclosure of its computation of damages and the evidence upon which the computation was based, <u>see</u> Fed. R. Civ. P. 26(a)(1)(A)(iii); (2) did not submit its expert report on damages by the discovery deadline included in Judge Berman's scheduling order of February 7, 2011 (Order dated Feb. 7, 2011); and (3) presents a different computation of damages in its current submissions than it did in its summary judgment papers (Def. Memo. at 4-5).

Both Judge Berman and I implicitly rejected Santander's contention that Bank of New York should be precluded from using its damages evidence because of a failure to disclose under Rule 26(a). Santander made such an argument in its summary judgment papers. (Defendant Santander Holdings USA, Inc.'s Memorandum of Law (I) in Opposition to the Motion for Summary Judgment by the Bank of New York Mellon Trust Company, National Association and (II) in Support of its Cross-Motion for Summary Judgment at 22). However, after

8

granting Bank of New York summary judgment on its breach of contract claim, Judge Berman referred the case to me for a hearing on damages, thus indicating that evidence on the issue would be offered. (Summary Judgment Order at 9; Order Referring Case to Magistrate Judge dated Dec. 16, 2011). Thereafter, I issued an order explicitly allowing the submission of expert reports on damages, and both parties have submitted such reports pursuant to that order. (January 26 Order; McConnell Report; Spector Report; Rebuttal Report of John J. McConnell, Ph.D., dated April 30, 2012 ("McConnell Rebuttal"), attached as Exh. 20 to Supplemental Declaration of David B. Hennes dated April 30, 2012 ("Supp. Hennes Decl.")). That is, Bank of New York timely submitted its expert damages evidence in accordance with two orders issued in this case.

Moreover, under Rule 37(c)(1), evidence that is not disclosed in accordance with Rule 26 will be precluded only if the failure was neither substantially justified nor harmless. Fed. R. Civ. P. 37(c)(1). "The purpose of this rule is to prevent the practice of 'sandbagging' an opposing party with new evidence"; so, in determining whether a party has been harmed, courts look to such factors as whether the introduction of the new evidence has prejudiced the party that has to meet it, and whether any such prejudice can be cured by a continuance. Underpinning & Foundation Skanska, Inc. v. Travelers Casualty & Surety Co. of America, 726 F. Supp. 2d 339, 348 (S.D.N.Y. 2010) (internal quotation marks omitted). Here, Santander has suffered no prejudice. Although there was some discussion of damages in the parties' summary

judgment papers, Judge Berman did not address the issue in his decision, but, rather, referred it to me for briefing and submission of evidence. Pursuant to the January 26 Order, Santander had ample time to respond to Bank of New York's McConnell Report with its own expert report and, indeed, has done so. (January 26 Order). At the hearing, the defendant had the opportunity to cross-examine the plaintiff's expert and great latitude to introduce new evidence.[3] Presumably, Santander agrees that it was afforded sufficient time, as it did not ask for a continuance to address Bank of New York's evidence. Thus, even though Bank of New York did not disclose its damages calculation pursuant to its initial disclosure obligations under Rule 26 and, in addition, presented a different damages calculation in its summary judgment papers, Santander was not "sandbagged" by any new evidence on damages. Any failure on Bank of New York's part was

---

[3] In a post-hearing submission, Bank of New York objected to certain evidence Santander presented at the hearing. (Transcript of Hearing dated July 16, 2012 ("Tr.") at 82; Letter of Douglas H. Flaum dated July 31, 2012 ("Flaum Letter") at 1). I deal with the specific objections in more detail below, but, to the extent that they are based on unfair surprise (Flaum Letter at 1, 7), they are overruled. Among the purposes of this hearing was to allow Santander to address Professor McConnell's expert opinion, as well as to flesh out the experts' opinions for the Court. Thus, it was to be expected that some new opinion would be presented. Moreover, Bank of New York took the opportunity to address alleged deficiencies in Mr. Spector's testimony and evidence both at the hearing and in its post-hearing evidentiary objections. (Flaum Letter at 2-7). It has therefore suffered no prejudice.

Santander objects to Bank of New York's post-hearing submission, asking that it be stricken or that, in the alternative, I accept Santander's own post-hearing submission as a response to Bank of New York's. (Letter of Douglas W. Henkin dated August 14, 2012, at 1, 3). I will not strike Bank of New York's submission and I have taken Santander's responses into account in this opinion.

harmless, and I will not preclude Bank of New York's expert evidence on damages on this procedural ground.

    C.   <u>Reference Agent</u>

According to Santander, there is another reason to discount, if not preclude, the McConnell Report -- the Third Supplemental Indenture requires that the reset rate be determined by "a reference agent selected by the Company." (3d Supp. Indenture, § 2.04(h); Def. Memo. at 5-8). Santander argues that, as the successor-in-interest to Sovereign, it alone has the authority to choose an expert to calculate the reset rate and the damages that are contingent on it. (Def. Memo. at 5). Santander's position is untenable.

The purpose of an award of damages in this contract action is to place Bank of New York in "as good a position as [it] would have been in had the contract been performed." <u>Ferrer v. Trustees of Univerity of Pennsylvania</u>, 825 A.2d 591, 609 (Pa. 2002) (internal quotation marks omitted). Thus, the measure of damages must indeed be determined by reference to the agreements between the parties. However, an action for damages does not seek to compel the breaching party to perform the contract, in which case the remedy would be specific performance. But "an order for specific performance is inappropriate where the moving party has an adequate remedy at law." <u>Beckman v. Vassall-Dillworth Lincoln-Mercury</u>, 468 A.2d 784, 790 (Pa. Super. Ct. 1983) (citing <u>Roth v. Hartl</u>, 75 A.2d 583 (Pa. 1950)). Here, Bank of New York sued for damages and, under Pennsylvania law, damages must be proved with reasonable

11

certainty, from facts sufficient to enable the court to arrive at an "intelligent estimate without conjecture." <u>Delahanty v. First Pennsylvania Bank, N.A.</u>, 464 A.2d 1243, 1257-58 (Pa. Super. Ct. 1983). The governing agreements provide the measure of damages for Santander's breach: the plaintiff should recover the distributions that it would have received had the interest rate been raised on January 30, 2009 to either (1) 7.41% or (2) "the market yield at that time for a non-convertible trust preferred security representing subordinated debt of the surviving entity with substantially the same terms and conditions [except for those terms and conditions explicitly excluded] as the Trust PIERS w[ould] have after the Change of Control," whichever is greater (3d Supp. Indenture, § 2.04(h); Am. Trust, Annex I, § 2(g)), plus interest on that amount.[4] Bank of New York has presented evidence supporting its argument and calculations. The procedure that would have been used to choose a reference agent if Santander had not breached the contract is irrelevant to the question of what amount in damages will make Bank of New York whole. Indeed, allowing (or compelling) Santander to choose a reference agent to determine the reset rate and consequent damages would displace the determination of damages from the fact-finder (here, the Court) to Santander's chosen expert

---

[4] Santander does not deny that Bank of New York is owed back interest; it merely objects to Bank of New York's calculation of such interest because it relies on the 13.61% rate derived from the McConnell Report. (Def. Memo. at 5 ("[A] strict reading of the Indenture . . . would allow [Santander] to select a reference agent, allow that reference agent to set the Reset Distribution Rate, and then use that Reset Distribution Rate to calculate back interest.").

witness.   See Delahanty, 464 A.2d at 1257 ("The determination of damages is a factual question to be decided by the fact-finder.").

D.   Right of Redemption

Santander argues that any damages calculation must take into account the right of redemption included in the Third Supplemental Indenture, which allowed Santander to redeem the Trust PIERS "at any time during the 30 days beginning on the 90th day after the occurrence of [a] Change of Control." (3d Supp. Indenture, § 2.06(c)(i); Def. Memo. at 9). Asserting that it "would likely have redeemed the Trust PIERS . . . had it believed the [t]ransaction constituted a Change of Control and the Reset Distribution Rate would have been set as high as [Bank of New York] now proposes," Santander insists that recognizing this right (and allowing Santander to exercise it) is the proper way to calculate Bank of New York's expectation damages and avoid awarding the plaintiff a windfall.[5] (Def. Memo. at 9-10).

The non-breaching party to a contract is entitled to recover damages that "were such as would naturally and ordinarily result from the breach, or . . . were reasonably foreseeable and within the contemplation of the parties at the time they made the

_____

[5] Santander also argues that it has not waived its right to redeem the Trust PIERS, pointing to a Warrant Amendment entered into by Bank of New York and Sovereign on the date of the merger between Sovereign and Santander. (Def. Memo. at 11-12; Amendment to Warrant Agreement dated Jan. 30, 2009 ("Warrant Amendment"), attached as Exh. 14 to Farrell Decl.). However, Bank of New York has not asserted that Santander's right of redemption had been waived; it argues that the right has expired. (Pl. Memo. at 5 n.5; Plaintiff The Bank of New York Mellon Trust Company, N.A.'s Reply Memorandum of Law in Support of its Damages Application at 7).

contract, and . . . can be proved with reasonable certainty."
Ferrer, 825 A.2d at 610 (internal quotation marks omitted).  Here,
the plain language of the redemption provision contradicts
Santander's position.

The window during which Santander had the option to redeem the
Trust PIERS opened "on the 90th day after the occurrence of [a]
Change of Control" and closed 30 days later.  (3d Supp. Indenture,
§ 2.06(c)(i)).  It reopens on the "fifth anniversary of the
occurrence of [a] Change of Control" and closes on the maturity
date of the debentures.  (3d Supp. Indenture, § 2.06(c)(ii)).  That
is, the time period is triggered by the "occurrence" of a Change of
Control, not by the date that a Change of Control is recognized or
declared by a court.  This is clear in the Third Supplemental
Indenture, which thus alerts the parties to the agreement that the
failure to recognize a Change of Control can result in the loss of
the original redemption right.  Any damages flowing from the loss
of this redemption right are damages that would "naturally and
ordinarily result from [a] breach," Ferrer, 825 A.2d at 610
(internal quotation marks omitted), that involved the failure to
reset the distribution rate after a Change of Control.[6]  Therefore,
the expired redemption right cannot operate to reduce Bank of New
York's damages.

---

[6] This conclusion is not altered by the Warrant Amendment.
Although the defendant asserts that the purpose of the agreement
"was to modify the terms of the warrants as if there had been no
change of control" (Def. Memo. at 11 (emphasis omitted)), Santander
makes no argument (and I cannot discern one) that the Warrant
Amendment affected the expiration of the redemption period in any
way.

E.   <u>Expert Opinions</u>

    1.   <u>Qualification of Experts</u>

Under Rule 702 of the Federal Rules of Evidence, before allowing a witness to testify as an expert, the court must determine whether the witness is qualified by assessing whether the "'proffered expert has the educational background or training in a relevant field.  Then the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer.'"  <u>Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.</u>, 769 F. Supp. 2d 269, 282-83 (S.D.N.Y. 2011) (quoting <u>TC Systems Inc. v. Town of Colonie</u>, 213 F. Supp. 2d 171, 174 (N.D.N.Y.2002) (internal quotation marks omitted)).  The qualification requirement is to be liberally construed, and

> [a]n expert should not be required to satisfy an overly narrow test of his own qualifications.  In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.

<u>Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.</u>, No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (internal citations and quotation marks omitted).

    a.   <u>Professor McConnell's Qualifications</u>

Professor McConnell holds a B.A. in Economics; an M.B.A.; and a Ph.D. in Finance and Econometrics, which he received in 1974. (McConnell Report, ¶ 10).  He has taught courses in the relevant field -- such as corporate finance, investments, portfolio management, and capital markets -- at various universities,

including Stanford University and the University of North Carolina. (McConnell Report, ¶ 10). He currently holds a named chair at the Krannert Graduate School of Management at Purdue University. (McConnell Report, ¶ 10). He has served as a consultant to government agencies, including the Department of Housing and Urban Development, the Department of Justice, and the Office of Thrift Supervision, as well as to investment banks, including Goldman Sachs and Merrill Lynch. (McConnell Report, ¶ 12). He has performed as an expert consultant on matters such as stock and bond pricing and evaluation, mergers and acquisitions, and the use and valuation of financial derivatives. (McConnell Report, ¶ 12). For example, Professor McConnell was hired by Goldman Sachs to develop models for valuation of securities. (Tr. at 5). He was also retained by Merrill Lynch to develop a "model for analysis and evaluation" of a "puttable, callable convertible bond" called a "liquid yield option note." (Tr. at 5). He has published widely in the fields of finance, economics, and management, and co-authored papers on the analysis and pricing of bonds and on trust preferred securities. (McConnell Report, ¶ 13). He has served and continues to serve on the editorial boards of a number of academic journals in the disciplines of finance and economics. (McConnell Report, ¶ 15).

Santander asserts that Professor McConnell is not qualified to provide an expert opinion regarding the reset rate because he "has no actual market experience" and is a "pure academic." (Def. Memo. at 12, 13 n.29). These objections are easily dispensed with. As

16

Bank of New York points out, the cases the defendant cites to support its proposition do not exclude expert evidence based on a lack of "'market experience,' but rather a lack of any knowledge or experience at all on the topic for which those experts provided an opinion." (Reply Memo. at 2 n.5 (emphasis omitted); Def. Memo. at 12 n.28).   That is not true of Professor McConnell's qualifications.   He has experience on the relevant topic -- the valuation of securities -- and he clearly meets the standard for qualification of expert witnesses.   See <u>Johnson & Johnson Vision Care</u>, 2006 WL 2128785, at *5.

### b.   <u>Mr. Spector's Qualifications</u>

Appropriately, Bank of New York does not object to the qualifications of Santander's expert, Mr. Spector.   Mr. Spector holds a B.A. in Economics from the University of Pennsylvania and an M.B.A. from the Fuqua School of Business at Duke University. (Spector Report, ¶ 19).   He has worked in the finance industry for over 23 years with large and sophisticated financial institutions. For example, in 1993, Mr. Spector began nine years of employment with Société Générale.   There he worked in "several different capacities," including one in which he "originated one of the first trust preferred securities underwritten" by the company.   (Spector Report, ¶ 18).   From 2007 to 2010, Mr. Spector was a Director at Fortis Securities, leading the company's Debt Capital Markets and Leverage Loan Trading activities.   (Spector Report, ¶ 17).   In these capacities he dealt with "high yield and investment grade corporate bond underwriting capabilities," as well as managing and

17

monitoring credit exposures, interacting with internal risk management and compliance groups, "overseeing the execution and settlement of trades, valuing and pricing complex and illiquid leveraged loan products, and reporting to senior management on portfolio credit and profitability." (Spector Report, ¶ 17). Currently, Mr. Spector is a Managing Director at NewOak Solutions, which is an advisory firm specializing in "valuation, analysis and consulting services for both financial and non-financial assets, with a particular focus on illiquid, distressed, and complex assets." (Spector Report, ¶ 13). Obviously, Mr. Spector has experience in the valuation of securities and is qualified to be an expert witness in this case. See Johnson & Johnson Vision Care, 2006 WL 2128785, at *5.

> 2. The Parties' Expert's Opinions

As noted above, the reset rate is the greater of 7.41% or a rate determined to be the market yield at the time of the Change of Control for a security "with substantially the same terms and conditions as the Trust PIERS will have after the Change of Control," except for certain enumerated excluded terms. (Am. Trust Decl., Annex I, § 2(g)). Those enumerated exclusions are the terms allowing for (1) a 30-day redemption period beginning 90 days after a Change of Control; (2) immediate redemption upon a Third Party Change of Control;[7] and (3) the payment of contingent distributions. (Am. Trust Decl., Annex I, §§ 2(g), 4(e)(i)(A),

---

[7] As noted above, a Third Party Change of Control did not occur in this case.

4(e)(ii), 2(c)).

### a.   Professor McConnell's Expert Opinion

Professor McConnell's report rests on the premise that the Trust PIERS itself is the most appropriate security for determining the reset rate.  In his opinion, the post-merger Trust PIERS has the features outlined in the relevant agreements and thus is a suitable security to use in the reset rate analysis.  Moreover, because its yield post-merger was observable, it provides the most accurate representation of the proper reset rate.  (Tr. at 15, 28-29).

In his report, Professor McConnell notes the characteristics of the relevant security for which the yield is being set.  First, it must be a trust preferred security.  The Trust PIERS satisfies this requirement.  (McConnell Report, ¶ 37).  Second, it must represent the subordinated debt of the surviving entity.  Professor McConnell notes that the post-merger Trust PIERS represented the subordinated debentures of Santander, which was the surviving entity.  (McConnell Report, ¶ 38; Tr. at 28). As for the other terms and conditions, Professor McConnell states:

> I understand that, of the terms discussed above that are affected by a Change of Control, that only two that should be considered in the market yield analysis are (i) the new redemption right beginning five years after the Change of Control and (ii) the extinguishment of the conversion feature.  Except for these two terms, which in my opinion, and as discussed in detail below, all other factors being equal, would only result in the observed market yield understating the market yield according to the analysis required by the Indenture (and even then, only by a de minimis amount), all other key terms and conditions of the Trust PIERS remain unchanged.  Thus, by using the Trust PIERS as the selected security, the terms and conditions of the security as of January 30, 2009 are

not only "substantially the same" as those of the Trust
PIERS after a Change of Control, they are identical.

(McConnell Report, ¶ 39 (footnotes omitted)).  He notes that this
is true only because Change of Control was not declared; had the
Change of Control been recognized, the Trust PIERS would not be an
appropriate security because one of its characteristics would be
the 90-to-120 day redemption right.  The drafters of the agreements
excluded this right from the description of the comparable security
because it would have the effect of driving the price of the
security up toward its call price and depressing the yield.  (Tr.
at 26-27).

    To calculate the reset rate, Professor McConnell observed that
the first Trust PIERS traded after January 30, 2009, was sold on
February 3, 2009, at a price of $17.25.  Based on that price he
calculated the yield to maturity of the Trust PIERS at 13.88%.
(McConnell Report, ¶ 44).  Matching it with another comparable
security, he then adjusted this yield rate down by 0.27% to account
for changes in market condition between January 30 and February 3,
"resulting in a market yield on January 30, 2009 of 13.61%."
(McConnell Report, ¶¶ 45-46; Tr. at 11).

    Professor McConnell noted that, pursuant to the exemptions
included in the reset rate provision, "the 90 to 120 day redemption
right [of Section 4(e)(i)(A) of Annex I of the Amended Trust
Declaration is] exclude[d] . . . as one of the terms and conditions
to consider in connection with the market yield analysis," leaving
only the redemption right beginning five years after the Change of
Control to be considered.  (McConnell Report, ¶ 52).  According to

20

Professor McConnell, an investor will tend to require a higher yield on a bond with a redemption right. (McConnell Report, ¶ 53). Because the redemption right at issue would have been triggered by a Change of Control, but Santander did not declare a Change of Control, the yield calculated in the expert report does not reflect this upward pressure. (McConnell Report, ¶ 54). The calculated rate of 13.61%, then, "understates the appropriate market yield." (McConnell Report, ¶ 54). However, because it was extremely unlikely on the date of the trade that the securities would be redeemed, the "Trust PIERS would have been trading . . . as if the redemption feature did not exist." (Tr. at 10).

Conversely, a bond with a conversion feature tends to decrease its market yield to maturity; therefore, the loss of the conversion feature upon a Change of Control would have increased the yield. (McConnell Report, ¶¶ 48-50). Nevertheless, because Santander did not declare a Change of Control, on February 3, 2009, trading in the Trust PIERS was possibly affected by the conversion right's downward pressure on market yield. (McConnell Report, ¶ 50). However, Professor McConnell opines, this understatement is likely de minimis because market conditions made the possibility of conversion remote. (McConnell Report, ¶ 51; Tr. at 9-10). Thus, he contends that the security was trading "as if it were nonconvertible." (Tr. at 25).

To check the reasonableness of his calculated yield of 13.61%, Professor McConnell confirmed that a significant amount of information about Santander's acquisition of Sovereign was

21

available to market participants from analysts, credit agencies, and the media, so that the trading in the Trust PIERS was accomplished with full information of the impending transaction. (Tr. at 11-12; 22-23).  Moreover, any uncertainty about the culmination of the merger that might have roiled the markets during the relevant period was put to rest on January 30, 2009, when the acquisition was accomplished.  (Tr. at 23-24).  The fact that the yield of the Trust PIERS did not change significantly after that date indicates that the market was functioning with sufficient knowledge.  (Tr. at 24).

In addition, Professor McConnell "examined the market yields of other securities comparable to the Trust PIERS as of January 30, 2009."  He determined that 13.61% "is well within the range of yields of other similar trust preferred securities," which extended from 8.28% to 20% as of that date.  (McConnell Report, ¶¶ 56-61 & Exh. 2; McConnell Rebuttal, Exh. 5; Tr. at 12-13).  For example, the Sovereign Capital Trust V and the Sovereign Capital Trust VI -- two trust preferred securities issued originally by Sovereign, which after the merger represented subordinated debt of Santander -- had yields of 12.89% and 11.81%, respectively.[8]  (McConnell

_____

[8] The yield of the Sovereign Capital Trust VI was calculated based on an "indicative value" or "mark," that is, "an opinion as to what a buyer in the marketplace would pay for a security" based on trades in other securities. (Tr. at 51-52, 90; Exh. 4 to Direct Examination of Bruce Spector).  According to Professor McConnell, marks are "customarily used by portfolio managers to establish the value of their portfolios."  (McConnell Rebuttal, ¶ 14).

The yield of the Sovereign Capital Trust V was calculated based on an actual trading price. (Tr. at 90; Exh. 4 to Direct Examination of Bruce Spector.

Report, Exh. 2; Tr. at 14). Moreover, Santander itself bought a
significant percentage of the Trust PIERS at a weighted average
yield of 12.06% during February 2009, the month after the merger.
(Tr. at 17; McConnell Rebuttal, Exh. 2; McConnell Report, ¶ 19;
Letter of Allan J. Stone dated Aug. 23, 2010, attached as Exh. 7 to
Hennes Decl.).

   Having confirmed to his satisfaction that the calculated yield
of the Trust PIERS was not aberrational, it was unnecessary, in
Professor McConnell's opinion, to perform a relative value analysis
("RVA") in order to identify a security comparable to the Trust
PIERS issued by a company comparable to Santander:

>   My view is [that performing an RVA] was not
>   appropriate, that it was unnecessary to do so, and

---

   In its post-hearing submission, Bank of New York objects to
testimony given by Mr. Spector questioning the reliability of the
source of Professor McConnell's marks, a company known as Capital
IQ. (Flaum Letter at 1, 3-4). The plaintiff did not assert a
contemporaneous objection to this testimony, although it did object
to an exhibit offered to support Mr. Spector's opinion that
Professor McConnell's use of Capital IQ's marks was ill-advised.
(Tr. at 87-88, 92-95, 140). This objection is overruled. To the
extent that it is based on the fact that Mr. Spector's company also
uses marks from Capital IQ, that affects the weight, not the
admissibility, of Mr. Spector's testimony. Similarly, the
objection to the exhibit -- Exhibit 5 to the Direct Examination of
Bruce Spector -- is based on a difference of (expert) opinion on
the calculation of a security's yield. (Flaum Letter at 4). This,
too, goes to the weight rather than the admissibility of the
evidence.

   Finally, Bank of New York objects to Mr. Spector's testimony
regarding his opinion that the Sovereign Capital Trust V was not an
appropriate security to use in determining the reset rate. (Flaum
Letter at 5-6). Again, Bank of New York failed to object
contemporaneously to this testimony. (Tr. at 96). Moreover, its
objection basically attempts to undermine the testimony on
substantive grounds. Once again, Bank of New York's argument does
not provide a reason to exclude the testimony.

arguably[] ill[-]advised to do so.

. . . .

[T]he indenture says an instrument representing the surviving entity[;] the surviving entity is [Santander][.]   [T]here is no need to search for an entity that is similar to [Santander] because [Santander] is the surviving entity.

Furthermore, there is no need to search for another security that embodies the characteristics set forth in the indenture because the Trust PIERS does embody those characteristics.

(Tr. at 28; McConnell Rebuttal, ¶ 9).   Therefore, according to Professor McConnell, the calculated Trust PIERS yield of 13.61%, because based on observable data, is the most accurate representation of the reset rate.  (McConnell Rebuttal, ¶¶ 9, 11).

### b.   Mr. Spector's Expert Opinion

Mr. Spector's analysis on behalf of Santander differs methodologically from Professor McConnell's.   In Mr. Spector's opinion, the Trust PIERS must be excluded from consideration in establishing the reset rate for a number of reasons.   According to him, the indenture requires a reference agent to calculate the reset rate as if it were pricing a brand new security.   (Tr. at 63).   That is, the analysis must proceed as if the security being priced "doesn't exist yet" and the company issuing it "doesn't exist yet" (Tr. at 80).   Therefore, the Trust PIERS -- or any other security issued by Sovereign or Santander -- is "not relevant . . . to th[e] analysis."   (Tr. at 80, 96).   Mr. Spector also opines that the Trust PIERS should be excluded from the universe of potential benchmark securities because (1) the market price of the Trust PIERS at the Change of Control did not accurately reflect the

24

strength of Santander, the surviving entity; (2) the Trust PIERS remained convertible, whereas the benchmark security should be non-convertible; and (3) in his experience, a reference agent would conduct an RVA of "comparable securities issued by comparable institutions" to determine the reset rate of the Trust PIERS. (Spector Report, ¶ 55).

Mr. Spector's RVA seeks to identify "a group of companies that have the closest comparable characteristics to the company that is attempting to issue the bonds." (Tr. at 66). To do so, the analysis consecutively applies a number of filters, winnowing down the universe of possible benchmarks to a workable number. (Tr. at 67). First, Mr. Spector identified 235 non-convertible trust preferred securities. (Spector Report, ¶ 57). He excluded those that were not issued by a parent company in the financial services industry (Spector Report, ¶ 58) and then those that did not trade at least 2,000 shares on each of the 30 days preceding January 30, 2009 (Spector Report, ¶ 59), resulting in 87 potentially comparable securities issued by 24 companies (Spector Report, ¶¶ 60-61).

The next phase of the RVA focuses on investigation of each of those 24 entities, comparing them with the characteristics of Santander. (Spector Report, ¶ 61 & App'x II). Santander is a non-broker-dealer that derives 1% of its operating revenue from investment banking, none from trust revenue, and 25% from non-interest income. (Spector Report, App'x II). In addition, its loan portfolio comprises 57% commercial loans, 32% family loans, and 10% consumer loans. Thus, the first filter in this phase

25

excluded broker-dealers. (Spector Report, ¶ 62). The next two excluded companies that derived more than 6% of their operating revenue from investment banking or from providing trust services. (Spector Report, ¶¶ 63-64 & App'x II). Mr. Spector then examined the ratio of non-interest income to operating revenue, "excluding any institution that earned more than 37% of its operating income from non[-]interest income activities." (Spector Report, ¶ 65 & App'x II). Finally, he assessed the risk of the entities' loan portfolios, excluding those companies whose portfolio included less than 41% or more than 71% commercial loans, less than 19% residential loans, and less than 5% consumer loans. (Spector Report, ¶¶ 66-68 & App'x II). This left four institutions that Mr. Spector deems comparable to Santander, each with one trust preferred security that meets the requirements of a benchmark security. (Spector Report, ¶ 69 & App'x II).

Next, Mr. Spector performed a credit analysis of each of the institutions "[t]o determine [its] relative magnitude of risk . . . in relation to [Santander]," based on profitability, asset quality, capital adequacy, liquidity, and loan decomposition. (Spector Report, ¶¶ 72-107). This resulted in the determination that M&T Bank Corp. is the "most comparable" and BancorpSouth the second most comparable to Santander. (Spector Report, ¶¶ 106-107, 119; Tr. at 72, 98). Based on this credit assessment, Mr. Spector opined that the reset rate "would be no more than the [8.71%] yield for M&T [Capital Trust IV] and no less than the [8.11%] yield for Bancorp[South Capital Trust I]." (Spector Report, ¶¶ 120, 123).

26

Using M&T's yield as a ceiling, he then made adjustments based on credit quality, trading volume, and structural features to arrive at the conclusion that the reset rate for the Trust PIERS "should be no more than 8.31%." (Spector Report, ¶¶ 121, 124-126; Tr. 73-77).

    c.   <u>Analysis</u>

An important question is whether the agreements forbid the use of the Trust PIERS in performing the reset rate analysis. If they do, Professor McConnell's report is significantly undermined; if they do not, Mr. Spector's report, which determined that the security is irrelevant to the analysis, is called into question. As I understand  Santander's arguments, there are two potential contract-based reasons that the Trust PIERS should be excluded: (1) the agreements require the reset rate to be determined based on a non-convertible security, thus prohibiting the use of the Trust PIERS, which remained convertible after January 30, 2009, because Santander failed to declare a Change of Control (Spector Report, ¶ 55(a)); and (2) the agreements require the reset rate to be determined as if it were a new security from a new issuer, thus prohibiting the use of the yield of the Trust PIERS and mandating an RVA.[9] In addition, Santander argues that Professor McConnell's

---

    [9] This overarching argument, which arose most clearly in Mr. Spector's testimony at the hearing, encompasses a couple of separate contentions in Santander's papers -- specifically, the assertions that (1) the "[i]nclusion of the Trust PIERS . . . would render the analysis inherently circular" (Spector Report, ¶ 55(b)) and (2) the "silen[ce]" of the agreements regarding whether the Trust PIERS can be included prohibits its use, instead requiring an "RVA of a comparable security with 'substantially similar' terms to the Trust PIERS." (Spector Report, ¶ 55(c)).

use of the Trust PIERS is, if not forbidden, then injudicious for a number of reasons, some of which overlap with the ones above.

i.   Contractual Language

Here is the contractual language describing the relevant reset rate:

> [T]he rate determined . . . as the market yield at that time for a non-convertible trust preferred security representing subordinated debt of the surviving entity with substantially the same terms and conditions as the Trust PIERS will have after the Change of Control [with exclusions].

(Am. Trust Decl., Annex I, § 2(g); 3d Supp. Indenture, § 2.04(h)).

This provision requires the analyst to determine the reset rate "as the market yield . . . for a non-convertible trust preferred security representing subordinated debt of the surviving company." That is, it does not require that the rate be determined "by exclusive reference to" the market yield of non-convertible trust preferred securities. Professor McConnell recognizes that the agreements "do[] not require that the reset distribution rate be set based on a nonconvertible security." (Tr. at 25). Rather, they require that the reset rate "be representative of the price or yield at which a nonconvertible security would trade." (Tr. at 25). That is, the provisions merely describe a security with certain characteristics, and mandate that the reset rate approximate that security's yield. There is no contractually-based limitation on the types of security that can or should be analyzed. So the person or entity determining the rate is given significant leeway to calculate the yield of a trust preferred security with certain characteristics, among them non-convertibility. Even Mr.

28

Spector seems to recognize this.  He testified that the agreements

> describe[e] for me a type of security.  It's telling me a
> nonconvertible    trust    preferred    security    that    is
> representative   of   subordinated   debt   of   the   surviving
> entity, and so it's laying out what that security and
> what the issuer needs to look like afterwards.

> But [] acting in my capacity as reference agent, I'm
> left with latitude, based on my experience, to actually
> then perform the process to get to that final rate reset.

(Tr. at 68).  He then concedes that the agreements "set[] forth

what you're looking for but not how to find it."  (Tr. at 69).

Thus, Santander's expert acknowledges that the relevant provisions

do not dictate the kind of securities that can be examined to

determine the reset rate; rather, they require that the reset rate,

once determined, approximate the yield of a security with the

delineated characteristics.

Understanding what the reset rate provisions actually dictate

clarifies what they do not.  As discussed, the analyst is not

prohibited from referencing convertible securities in making the

reset rate determination.  Nor is there language in the provisions

that prohibits use of the Trust PIERS itself to determine the reset

rate.  At the hearing, Santander argued that, if the agreements

intended the reset rate to be determined by recourse to the price

of an existing security, such as the Trust PIERS, they would have

used different language -- language setting the rate as the "fair

market value of [certain identified] securities . . . as calculated

on an average basis for 20 prior trading days," for example.  (Tr.

65-66; Exh. 2 to Direct Examination of Bruce Spector at 20).[10] However, the fact that the agreements do not <u>mandate</u> recourse to the market yield of an existing security does not mean that they <u>prohibit</u> it. Similarly, it is not reasonable to infer that use of the term "reference agent" in the provisions mandates an RVA. As Mr. Spector testified, a reference agent is "left with latitude, based on [his] experience, to . . . perform the process to get to th[e] final reset rate." (Tr. at 68). While an RVA is one avenue to the reset rate, it is not the only one.

Mr. Spector also charges that the use of the Trust PIERS to determine the reset rate renders the analysis "circular." (Spector Analysis, ¶ 55(b)). He provides very little support for such a statement, indicating when pressed only that, because the Trust PIERS is convertible, it is "irrelevant" to his analysis. (Tr. at 114). To the extent that this argument has additional content beyond that contention, I understand it to mean that determining the yield of the Trust PIERS after a Change of Control by examining the yield of Trust PIERS itself after a Change of Control is improper because tautological. However, that ignores two important points: first, as noted above, nothing in the language of the relevant agreements prohibits the use of the Trust PIERS; second,

---

[10] After the hearing, Bank of New York objected to Mr. Spector's testimony on this issue, as well as an exhibit offered to support the testimony. (Flaum Letter at 1, 2-3). However, at the hearing, I overruled Bank of New York's objection. (Tr. at 65). Although, as will be seen, I do not find the testimony or evidence particularly probative, I see no reason to revisit my previous ruling here, as Bank of New York has not presented an argument that demonstrates the evidence is inadmissible.

in the situation at hand, where Santander failed to declare a Change of Control, any tautology evaporates. Professor McConnell recognized that, had a Change of Control been declared, the use of the Trust PIERS would have been inappropriate. (Tr. at 26-27). But the failure to declare a Change of Control resulted in the post-merger Trust PIERS closely approximating the security described in the agreements. Therefore, this objection, to the extent that it is based on contractual language, is meritless.

> ii. Suitability of Trust PIERS for Use in Reset Rate Analysis

Of course, the mere fact that the agreements do not prohibit use of the Trust PIERS in determining the reset rate does not mean that the security is suited to the task. Mr. Spector asserts that the Trust PIERS is inappropriate because (1) it did not "reflect the credit quality of the surviving entity" during the relevant time period; (2) it was convertible and therefore did not reflect the yield of a non-convertible security; and (3) the best practice of a reference agent would be to conduct an RVA rather than to peg the reset rate to the yield of the Trust PIERS. (Spector Report, ¶ 55).

Professor McConnell addresses each of these objections. In order to ascertain whether the market was operating with sufficient information on February 3, 2009, when the Trust PIERS traded, Professor McConnell investigated whether information about the merger and its effect on the Trust PIERS was available to investors. As noted above, he found that significant information was available from a variety of sources, including analysts and

credit rating agencies. (Tr. at 22-23). Therefore, he found that the objection that the price and yield of the Trust PIERS did not reflect the Santander's credit quality of the implications of Santander's acquisition on the security was "not credible." (McConnell Rebuttal, ¶¶ 26-32; Tr. at 22-23). Indeed, Santander itself participated in this market, purchasing the Trust PIERS at a yield of 12.06% during the month of February. (Tr. at 17). Mr. Spector admits that "the markets were fully aware of the . . . impending . . . transaction [] between Santander and Sovereign." (Tr. at 105). Santander offers evidence that, in other cases, the yields of trust preferred securities declined after their issuers were acquired by more credit-worthy institutions. (Tr. at 83-84; Exh. 3 to Direct Examination of Bruce Spector).[11] But this evidence is only tenuously related to the relevant security and does not adequately rebut Bank of New York's evidence that the market appropriately priced the Trust PIERS. Indeed, Mr. Spector repeatedly asserted that his opinion regarding the reasons traders in the market were buying and selling the Trust PIERS at its price and yield would be mere "speculat[ion]." (Tr. at 105, 106-07, 109-10, 111, 112-13).

Professor McConnell also addresses the convertibility issue. He contends that, in order to make conversion an attractive option,

---

[11] Bank of New York objected to this evidence at the hearing. (Tr. at 82, 140). In its post-hearing evidentiary objections it attempts to undermine the substance of Mr. Spector's testimony and evidence. (Flaum Letter at 6-7). The objection is overruled because Bank of New York has not demonstrated why the evidence should not be admitted.

the "market price of the security into which the trust preferred security may be converted [must] rise[] above the pre-specified conversion price." (McConnell Report, ¶ 51). Because the conversion price at the relevant time was over $90.00 and the market price of the security into which the Trust PIERS could be converted after the acquisition was under $8.00, it was highly unlikely that the Trust PIERS would be converted. (McConnell Report, ¶ 51). Therefore, the market would have treated the Trust PIERS as being non-convertible, making it an appropriate security to analyze in connection with the reset rate determination. (McConnell Report, ¶ 51). Mr. Spector rejoins that, during the relevant period, "the market would have assumed that the securities were still convertible." (Tr. at 85). That may be true -- after all, the Trust PIERS was, indeed, still convertible -- but it does not address Professor McConnell's point that, because the conversion was so far "out of the money," the effect on the yield would have been minimal, if it existed at all. (Tr. at 9, 24).

Finally, Mr. Spector asserts that a reference agent would engage in an RVA rather than use the Trust PIERS' yield to set the reset rate. But Professor McConnell points out that the yield he calculated is based on observable data -- the yield for a trust preferred security that actually represented the subordinated debt of Santander, the surviving entity. (McConnell Rebuttal, ¶¶ 9, 11; Tr. at 15, 28-29). On the other hand, Mr. Spector's analysis relied heavily on his discretion for the criteria selected to winnow a list of 235 non-convertible trust preferred securities

down to four comparables. (Tr. at 121-22, 128). The subjectiveness of this process is perhaps most obvious when examining the final series of filters used to determine the ultimate short-list. For example, noting that Santander received 1% of its operating revenue from investment banking and none of its operating revenue from trust operations, Mr. Spector filtered out entities that made more than 6% of their operating revenue from each of these two sources. (Spector Report, ¶¶ 63-64 & App'x II). However, had he chosen a different cut-off -- had he chosen to limit comparables to those entities that made less than 5% of their operating revenue from each of these sources -- a number of additional companies would have been excluded, among them M&T Bank Corp., which issued the very security that Mr. Spector found most comparable to the Trust PIERS. (Spector Report, App'x II; Tr. at 129-30). Had Mr. Spector placed a slightly different limit on the acceptable ratio of non-interest income to operating revenue, for example, 35% or less rather than 37% or less, both M&T Bank Corp. and BancorpSouth -- the two most comparable securities to the Trust PIERS according to this analysis -- would have been excluded. (Spector Report, App'x II). Mr. Spector was unable to identify any objective reason for either the filters chosen or the limits imposed. (Tr. at 125-28).

I express no opinion on whether an RVA is an appropriate tool to determine the reset rate in this situation or whether Mr. Spector properly used the tool. But on the evidence presented, Professor McConnell's analysis presents a more accurate and

34

objective representation of that rate.   Therefore, I recommend resetting the relevant rate to 13.61% and calculating Bank of New York's damages using that rate.   Under the agreements, the Trust PIERS holders are entitled to "unpaid back interest since the Change of Control occurred on January 30, 2009, plus compounding interest on the unpaid back interest at 13.61%." (Pl. Memo. at 15; 3d Supp. Indenture, § 2.04(b); Am. Trust Decl., Annex I, § 2(a)). Thus, the measure of damages is "the difference between the distributions that [the Trust PIERS holders] actually received and the distributions that they should have received . . . (i.e., the difference between 4.375% and the Reset Rate of 13.61%, or 9.235%), compounded quarterly at the Reset Rate of 13.61%." (Pl. Memo. at 16).   Professor McConnell calculates this amount to be $305,626,022.00 as of June 1, 2012.[12]  (Pl. Hearing Exh. 1; Tr. at 39-43).   Pursuant to the agreement, this unpaid interest will continue to accrue at a rate of 13.61% on a daily basis, and will compound on a quarterly basis, until it is paid to the Trust PIERS holders. (3d Supp. Indenture, § 2.04(b); Am. Trust Decl., Annex I, §2(a)).

    F.   <u>Bank of New York's Attorneys' Fees and Costs</u>

Bank of New York asserts that an indemnification provision in the Base Indenture (Base Indenture, § 607(3)) requires Santander to pay the $3,160,012.31 in fees and costs (including expert fees and costs) that the plaintiff has incurred in prosecuting this

---

[12] As noted, Santander objects to this calculation only insofar as it uses Professor McConnell's reset rate of 13.61%, rather than the reset rate Santander would prefer.

litigation.  (Second Supplemental Declaration of David B. Hennes
dated July 13, 2012 ("2d Supp. Hennes Decl."), ¶ 12; Third
Supplemental Declaration of David B. Hennes dated Aug. 27, 2012
("3d Supp. Hennes Decl."), ¶¶ 5, 9 & Exhs. 26-27).  Other than
$646,137.65 expended in connection with the retention of two
experts to assist in the litigation, the full amount was charged by
the two law firms representing Bank of New York in this case --
Fried, Frank, Harris, Schriver & Jacobson LLP ("Fried Frank") and
Dechert LLP ("Dechert").  (Pl. Memo. at 17-18; Hennes Decl., ¶¶ 18-
22 & Exhs. 15-19; Declaration of Glenn E. Siegel dated March 15,
2012 ("Siegel Decl."), ¶ 8 & Exhs. 2-3; Plaintiff the Bank of New
York Mellon Trust Company, N.A.'s Redacted Time Entries in Support
of Its Attorneys' Fees Request submitted July 19, 2012 ("Time
Entries"); 2d Supp. Hennes Decl., ¶ 11; 3d Supp. Hennes Decl., ¶¶
5, 9 & Exhs. 26-27).  As support for these fees, the firms have
submitted a summary table showing the time, fees, and costs charged
by Fried Frank, and a corresponding summary for Dechert (Hennes
Decl., Exh. 15; Siegel Decl., Exh. 2; 2d Supp. Hennes Decl., Exh.
22; Supplemental Declaration of Glenn E. Siegel dated July 13, 2012
("Supp. Siegel Decl."), Exh. 4); the billing summaries for each of
Fried Frank's and Dechert's invoices in the matter (Hennes Decl.,
Exh. 16; Siegel Decl., Exh. 3; Supp. Siegel Decl., Exh. 5);
redacted copies of invoices Fried Frank incurred in connection with
its retention of the experts (Hennes Decl., Exhs. 17-19; 2d Supp.
Hennes Decl., Exh. 25; 3d Supp. Hennes Decl., Exh. 27); and copies
of timekeeping records, which are partially redacted (Time Entries;

2d Supp. Hennes Decl., Exhs. 23, 24; Supp. Siegel Decl., Exh. 5; 3d Supp. Hennes Decl., Exh. 26).[13]   Bank of New York also seeks prejudgment interest at a rate of 6% on these unpaid fees and costs, which it has calculated as $130,150.23 as of August 24, 2012. (3d Supp. Hennes Decl., ¶ 12 & Exh. 28).

Santander counters that, pursuant to the agreements, it is responsible for reimbursing fees paid by Bank of New York for counsel representing "[Bank of New York] as [Bank of New York]," but not fees incurred by Fried Frank, which represented Bank of New York on behalf of the noteholders who instigated this litigation. (Def. Memo. at 21-22; Defendant Santander Holdings USA, Inc.'s Memorandum of Law in Opposition to Bank of New York Mellon Trust Company, National Association's Request for Attorneys' Fees and Costs dated July 30, 2012 ("Def. Fee Memo.") at 2-3, 7-9).   It further asserts that the record here fails to establish that Bank of New York has paid any of the invoices from either firm; instead,

---

[13] Santander originally objected to Bank of New York's fee request because it lacked contemporaneous time records, which Santander asserts are required under Second Circuit precedent such as Scott v. City of New York, 643 F.3d 56, 57 (2d Cir. 2011), and New York State Association for Retarded Children v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). (Def. Memo. at 19-20). These records have now been provided, so it is unnecessary to address this objection. I note, however, that in cases where the right to attorneys' fees is governed by state law that does not mandate such contemporaneous records, the Second Circuit's requirement gives way. See, e.g., Riordan v. Nationwide Mutual Fire Insurance Co., 977 F.2d 47, 53 (2d Cir. 1992) ("State law creates the substantive right to attorney's fees, a right which cannot be deprived by applying the contemporaneous time records rule adopted in this Circuit." (internal citations omitted)); Farb v. Baldwin Union Free School District, No. CV 05-0596, 2011 WL 4465051 (E.D.N.Y. Sept. 26, 2011) (refusing to apply contemporaneous time records rule in case governed by state law).

it appears that both firms were paid by the noteholders pursuant to a separate indemnification agreement. (Def. Fee Memo. at 8-9). This, it argues, means that Santander need not indemnify Bank of New York for any fees, because Bank of New York has not paid any fees. (Def. Fee Memo. at 8-9). It further contends that the requested fees, if taxable to Santander, should be reduced for more conventional reasons, such as block billing and duplication of effort. (Def. Fee Memo. at 9-12).

### 1.   Indemnity Provisions

Under Pennsylvania law, indemnity provisions are narrowly construed using conventional principles of contract law. Chester Upland School District v. Edward J. Meloney, Inc., 901 A.2d 1055, 1059 (Pa. Super. Ct. 2006). When the terms of a contractual provision are clear and unambiguous, the meaning of the agreement is determined from the contract alone. Mace v. Atlantic Refning Marketing Corp., 785 A.2d 491, 496 (Pa. 2001).

The Base Indenture includes a broad indemnification provision requiring the issuer of the relevant securities (here, Santander) "to indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of this trust or performance of its duties hereunder . . . ." (Base Indenture, § 607(3)). Neither party denies that Bank of New York brought this litigation and incurred expenses (without negligence or willful misconduct) "in connection with the . . . administration of th[e] trust or

38

performance of [Bank of New York's] duties" under the Base
Indenture and its supplements.   Specifically, Bank of New York
filed this action at the direction of certain noteholders pursuant
to Section 512, which allows "[t]he [h]olders of a majority in
principal amount of the [relevant securities] of any series . . .
to direct the time, method and place of any proceeding for any
remedy available to the Trustee." (Base Indenture, § 512).   Thus,
it would appear that Santander must pay any costs and fees incurred
by Bank of New York.[14]

Section 507 of the Base Indenture, on which Santander pins its
hopes, does not affect its responsibility in this case.   That
section outlines the requirements that must be fulfilled before a
noteholder (or group of noteholders) can bring an action in its own
name, rather than direct the Trustee to bring an action as a
plaintiff:

(1) the noteholder must have given written notice to the
Trustee of a breach (Base Indenture, § 507(1));

(2) the holders of at least 25% of the securities in the
same series as the complaining noteholder's must have
made written request to the Trustee to institute an
action in the Trustee's name (Base Indenture, § 507(2));

(3) the complaining noteholder must "have offered
indemnity reasonable to the Trustee against costs,
expenses and liabilities to be incurred in compliance
with such request" (Base Indenture, § 507(3));

(4) the Trustee must have failed to institute such a

---

[14] The breadth of this agreed-upon indemnity is underscored by
Section 601(d), which excuses the Trustee from incurring any
expense or liability in the performance of its duties under the
indenture if it has "reasonable grounds for believing repayment of
such funds or adequate indemnity against such risk or liability is
not reasonably assured."   (Base Indenture, § 601(d)).

proceeding within 60 days of the last of the three aforementioned events to occur (Base Indenture, § 507(4)); and

(5) the holders of a majority of the securities in the series must not have given the Trustee "direction inconsistent with such written request" (Base Indenture, § 507(5)).

The obvious point to make about this provision is that it is irrelevant here because Bank of New York did not proceed under Section 507 when it brought this action; it proceeded under Section 512 (Plaintiff The Bank of New York Mellon Trust Company, N.A.'s Memorandum of Law in Response to Defendant Santander Holdings USA, Inc.'s Opposition to Plaintiff's Request for Attorneys' Fees and Costs ("Pl. Fee Reply") at 3 n.5; Siegel Decl., ¶ 3), which provides an entirely different mechanism. Unlike Section 507, Section 512 is operative only when the holders of more than 50% in principal amount of a series agree on a course of action. (Base Indenture, § 512). Also in contrast to Section 507, Section 512 does not require that the noteholders indemnify or offer to indemnify the Trustee. Rather, it allows the noteholders to direct the Trustee to bring suit with only the following limitations: (1) the direction must not conflict with the law or the Indenture and (2) it should not "be unjustly prejudicial" to the noteholders "not joining in the direction." (Base Indenture, § 512(1), (2)).

Moreover, it is not clear that, even if Section 507 were applicable here, the noteholders would have to indemnify Bank of New York under the Indenture. Section 507 does not require complaining noteholders to indemnify the Trustee in the event that the Trustee brings an action at their behest. Rather, it requires

40

complaining noteholders to offer reasonable indemnity to the Trustee before an action can be brought in the noteholders' name. Obviously, the drafters of the Base Indemnity knew how to craft an unambiguous indemnity provision -- they included one at Section 607(3). Pointing to the requirement of an offer to indemnify in a provision governing the situation in which a noteholder can bring an action in its own name is too oblique to overcome the broad indemnity provision of Section 607(3).[15]

Santander's obligation under Section 607 is not undermined by the fact that, here, there is an agreement under which the noteholders indemnify Bank of New York. Pursuant to the indemnification agreement between the noteholders and Bank of New York, the noteholders agreed to "pay and reimburse and be liable to . . . and indemnify and hold harmless" Bank of New York for "costs and expenses (including . . . reasonable fees and disbursements of legal counsel[)]" arising out of this action. (Letter of Directing Noteholders dated December 17, 2010 ("Indemnification Agreement"),

---

[15] This interpretation does not render Section 507(3)'s offer of indemnity superfluous. See LJL Transportation, Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 647-48 (Pa. 2009) (emphasizing that contracts will be interpreted to avoid superfluity). Although the offer of indemnity required by Section 507(3) might not result in actual indemnification by the noteholders of the Trustee's expenses, there is a rational reason to require a noteholder who seeks to file (or merely ends up filing) an action in its own name to make such an offer. An offer to indemnify the Trustee should it bring an action requires a noteholder to represent that it could afford to support costly litigation against the institution that issued the securities. Thus, the offer functions as an assurance that the noteholder could ably represent its interests and those of its similarly-situated investors, which would be especially valuable when only a minority of noteholders of the same series agree on a course of action.

attached as Exh. 2 to Declaration of Aaron T. Tucker dated August 14, 2012, at 3). But there is no reason that a side agreement between the noteholders and the Trustee should affect the requirement in the Base Indenture that Santander indemnify Bank of New York.

Even if the terms of the Indemnification Agreement were relevant to Santander's obligations under the Indenture, they would not support Santander's position here, as it is apparent that the agreement was crafted so as not to interfere with Bank of New York's rights under Section 607(3) of the Base Indenture. The Indemnification Agreement mandates that "[a]ll fees, disbursements, expenses and costs of Dechert and Fried Frank . . . are, and shall be, considered for all purposes as expenses incurred by [Bank of New York]," which "shall seek indemnification from [Santander] . . . pursuant to Section 607 of the [Base] Indenture." (Indemnification Agreement at 5). That is, the Indemnification Agreement makes clear that the amounts paid by the noteholders for costs and attorneys' fees are, for the purposes of the Indenture, expenses of Bank of New York and subject to the indemnification provision of Section 607. Additionally, the fact that the noteholders advanced these costs to the plaintiff's attorneys and experts does not protect Santander from its legal obligation to indemnify Bank of New York.[16] See, e.g., White v. Center Point Farm

---

[16] As Bank of New York pointed out during closing arguments, Santander's interpretation of its obligations would likely result in no indemnification, at all. Santander would, as it did here, refuse to indemnify Bank of New York during the pendency of the action, so Bank of New York would refuse to act under Section

Homeowners Association, No. 1169 EDA 2010, 2010 WL 5860739 (Pa. Com. Pl. May 27, 2010) (awarding attorneys' fees to plaintiff pursuant to contract although fees paid by third party); see also Ed A. Wilson, Inc. v. General Services Administration, 126 F.3d 1406, 1409-10 (Fed. Cir. 1997) (holding that plaintiff "incurred" attorneys' fees and was entitled to award of such fees under Equal Access to Justice Act although third party actually paid fees); Manor Healthcare Group v. Lomelo, 929 F.2d 633, 638-39 (awarding costs under Rule 54(d) of the Federal Rules of Civil Procedure to prevailing party although third party actually paid costs); Guarrasi v. Gibbons, Civil Action No. 07-5475, 2011 WL 382598, at *1 (E.D. Pa. Feb. 3, 2011) (same); Sozio v. Sears, Roebuck and Co., No. CIV A. 90-7483, 1994 WL 229660, at *2 (E.D. Pa. May 26, 1994) (same); Compagnie des Bauxite de Guinee v. Hammermills, Inc., Civ. A. No. 90-0169, 1992 WL 122712, at *3 n.6 (D.D.C. May 29, 1992) (characterizing as "dubious" the argument that a litigant cannot recover attorneys' fees to which he is legally entitled if they have actually been paid by third party and collecting cases). Finally, there is no probability that Bank of New York will benefit from a windfall by receiving an award of attorneys' fees for which it has not paid, as, "to the extent that the Trustee[] h[as] rights to indemnification by [Santander] . . . , the Directing Holders shall be subrogated to the rights of the Trustee[] to obtain

---

607(d) of the Base Indenture unless indemnity was provided by another entity; if the noteholders stepped up to indemnify Bank of New York, Santander would not be required to indemnify because the noteholders had advanced the fees. (Hearing Transcript dated Aug. 21, 2012 ("Closing Tr.") at 42).

payment from [Santander]." (Indemnification Agreement at 5).

    2.  <u>Attorneys' Fees</u>

All parties agree that the right to costs and attorneys' fees derives from the parties' agreements, which are governed by Pennsylvania law. (Pl. Memo. at 16-17; Def. Memo. at 21; Def. Fee Memo. at 9; Pl. Fee Reply at 7-10). Although under Pennsylvania law consideration of the reasonableness of contractually-based attorney fee awards is not required, neither is it forbidden. <u>See</u> <u>McMullen v. Kutz</u>, 985 A.2d 769, 776-77 (Pa. 2009) (stating that "the trial court <u>may</u> consider whether the fees claimed to have been incurred are reasonable, and . . . reduce the fees claimed if appropriate" (emphasis added)). Because such analysis provide a "safety valve" guarding against the charging of excessive fees, <u>id.</u> at 776, I will inquire into the reasonableness of the requested attorneys' fees and costs.

Santander does not challenge the hourly rates charged, but argues that the number of hours expended is unreasonable. (Def. Fee Memo. at 9). The defendant makes five specific requests: (1) Fried Frank's fees should be reduced by 30% across the board to account for block-billing and vague entries (Def. Fee Memo. at 9-10); (2) Dechert's fees should be reduced by 50% to correct overbilling due to duplication of work (Def. Fee Memo. at 10-11); (3) all fees charged for work on the "intercreditor agreement" and/or "allocation agreement," which seems to have governed allocation of costs among the noteholders, should be disallowed (Def. Fee Memo. at 11-12); (4) all expert fees should be disallowed

44

because there is insufficient evidence to support them (Def. Fee Memo. at 12); and (5) reimbursement for meals should be denied (Def. Fee Memo. at 12-13).

> a.   Block Billing

Santander argues that the time records provided by Fried Frank (and, to a lesser extent, by Dechert) suffer from "block billing" and "vagueness." (Def. Fee Memo. at 9-10 & n.19). This, Santander argues, prevents any evaluation of "whether the time devoted to each task was reasonable." (Def. Fee Memo. at 10). The defendant asks that Fried Frank's requested fees be reduced by 30%. (Def. Fee Memo. at 10).

Courts in Pennsylvania define "block billing" as "a time-keeping method by which each lawyer and legal assistant enters the total time daily spent working on a case, rather then itemizing the time expended on certain tasks." E. Aaron Enterprises, Inc. v. Carolina Classified.com LLC, No. 10-1087, 2010 WL 2991739, at *3 n.3 (E.D. Pa. July 27, 2010). Although it is "not the ideal time keeping method," it is "a common practice that will be upheld if there is a reasonable correlation between the various activities listed in a block and the time spent completing those tasks." Hatchett v. County of Phildelphia, No. 09-1708, 2010 WL 4054285, at *4 (E.D. Pa. Oct. 15, 2010).

Fried Frank and Dechert have produced ample evidence to support their fee petition, including detailed contemporaneous time records setting out the number of hours expended by each timekeeper, an itemized account of the work, and the billed amount

45

for each entry.  See E. Aaron Enterprises, 2010 WL 2991739, at *3
(holding a fee petition including such information sufficient).  It
is true that many of Fried Frank's and some of Dechert's time
entries are block-billed.  (2d Supp. Hennes Decl., Exhs. 23, 24;
Supp. Siegel Decl., Exh. 5).  However, the entries are generally
sufficiently detailed and specific to determine that the time spent
on the few tasks aggregated in each entry is reasonable.  Indeed,
Santander specifies only one entry as an example of Fried Frank's
assertedly egregiously vague billing entries.  (Def. Fee Memo. at
10).  However, it is not sufficient to present one allegedly vague
entry and require the Court to extrapolate from it.  Rather, the
proper way to challenge a fee petition that includes the
information provided in Fried Frank's and Dechert's time records is
to point to the specific entries that are vague or unreasonable,
explain why they are vague or unreasonable, and then allow the
Court to "determine whether the hours reasonably correlate to all
of the activities performed." United States ex rel. John Doe I v.
Pennsylvania Blue Shield, 54 F. Supp. 2d 410, 414-15 (M.D. Pa.
1999) (rejecting defendant's "general argument[s]" to reduce fee
request when it failed to point to "specific hours" and entries to
which it objected).  No such analysis has been conducted here.
Therefore, I do not recommend reduction in attorneys' fees on
grounds of block billing or vagueness.

b.   Duplication of Effort

Santander questions the need for the plaintiff to be
represented by two law firms in this case, asserting that Bank of

46

New York "does not claim that Dechert provided any special expertise or substantive knowledge that Fried Frank was unable to offer." (Def. Fee Memo. at 10). In addition, it argues that the Dechert's hours "unreasonably increased" the time billed in this case, pointing to the fact that both firms "spent a considerable amount of time reviewing the pleadings." (Def. Fee Memo. at 11; (Declaration of Sean Farrell dated July 30, 2012 ("2d Farrell Decl."), Exh. 10). Santander suggests a 50% reduction in Dechert's fees.

Santander's first objection is incorrect. As Bank of New York points out, it asked Dechert to "monitor the litigation and assist Fried Frank" because of its "familiarity with [Bank of New York's] role as Trustee in these types of matters." (Pl. Memo. at 18 n.17; Pl. Fee Reply at 8). Thus, the plaintiff has claimed that Dechert had "special expertise or substantive knowledge" that Fried Frank lacked.

Given this expertise, it is understandable that Bank of New York would want Dechert attorneys to review the pleadings -- and the time Dechert spent doing so is the only time that Santander has put at issue here, see Pennsylvania Blue Shield, 54 F. Supp. 2d at 414. The series of time entries from Dechert attorneys that includes review of pleadings reflect 38.9 hours, and only a fraction of that time was spent on the allegedly unnecessary exercise. (2d Farrell Decl., Exh 10; Pl. Fee Reply at 8). This amount of time does not indicate an "unreasonabl[e]" duplication of effort in this case. Rode v. Dellarciprete, 892 F.2d 1177, 1187

(3d Cir. 1990) (holding that reduction of attorneys' fees for duplication of effort is warranted only when attorneys are unreasonably doing same work).

      c.   Allocation Agreement

     The allocation agreement, also called the intercreditor agreement, "defined the rights and responsibilities of the Directing Holders responsible for directing [Bank of New York] to initiate and prosecute this litigation." (Pl. Fee Reply at 8). Santander balks at indemnifying Bank of New York for these fees because "there is no way [they] could be considered an expense" of Bank of New York. (Def. Fee Memo. at 12). Bank of New York points out, however, the allocation agreement was necessitated by (1) the requirement in the Indenture that holders of more than 50% of the Trust PIERS "act in concert to direct" Bank of New York and (2) Santander's refusal to respond to Bank of New York's requests to pay its fees. (Pl. Fee Reply at 8-9; Siegel Decl., ¶ 6 & Exh. 1). That is, without such an agreement, Bank of New York could not have acted in this litigation. As such, the fees associated with its drafting are compensable.

      d.   Expert Fees

     Santander claims that Bank of New York "waived" its right to reimbursement of expert fees when it did not provide "completely unredacted supporting documentation." (Def. Fee Memo. at 12). The support for this purported waiver is a letter from Fried Frank attorney David B. Hennes stating that Bank of New York "has withdrawn its request for reimbursement of the fees associated with

any entry that still contains a redaction." (Letter of David B. Hennes dated July 18, 2012 ("Hennes Letter"), attached as Exh. 1 to 2d Farrell Decl.).

That is a distortion of the record. The Hennes Letter makes it clear that the only fees for which Bank of New York withdrew its request for reimbursement were attorneys' fees reflected in 41 time entries including redactions. (Hennes Letter). The letter even recites the total amount of fees affected by this withdrawal -- $73,663.50. (Hennes Letter). Given that the expert fees claimed add up to a significantly larger amount -- one in the hundreds of thousands of dollars -- it is clear that Bank of New York did not "waive" its right to collect expert fees in the Hennes Letter. Indeed, it is disconcerting that Santander would put forward this argument, knowing, as it must, my familiarity with the disputes surrounding the redactions in the attorneys' time records. I do not recommend reduction of Bank of New York's claimed expert fees.

e.  Meal Reimbursement

Santander objects to $569.29 reflecting costs for meals, asserting that these charges are not compensable because "there is no indication . . . that these meals were required by out-of-town travel." (Def. Fee. Memo. at 12).

Courts in Pennsylvania have disallowed recovery of expenses associated with meals when the basis for the award of costs is a statute or rule. See Pelzer v. City of Phildelphia, 771 F. Supp. 2d 465, 473 (E.D. Pa. 2011) (disallowing cost of meals because not authorized by 28 U.S.C. § 1920); Walker v. Upper Merion Police

Department, Civil Action No. 94-4888, 1996 WL 37822, at *10-11
(E.D. Pa. Jan. 26, 1996) (same); In re Farnese, 948 A.2d 215, 218
(Pa. Commw. Ct. 2008) (disallowing cost of meals because not
authorized by Pennsylvania statute governing award of costs), rev'd
on other grounds, 17 A.3d 357 (Pa. 2011). Here, however, the basis
of the award is an indemnification provision in the parties'
agreements. Thus, I am not constrained by statute or rule, but
only by whether the costs are reasonable. See McMullen, 985 A.2d
at 776-77. There is nothing unreasonable about charges totaling
less than $600.00 for attorney meals, whether taken at the office
or out-of-town, in a hard-fought litigation that began over one-
and-a-half years ago and at which hundreds of millions of dollars
are at stake.

f.   Prejudgment Interest

Bank of New York seeks pre-judgment interest on the unpaid
fees and costs at a rate of 6% per annum. (Pl. Memo. at 20 n.15;
3d Supp. Hennes Decl., ¶ 10). Santander has not contested this
component of the fee request. (Hennes Decl., ¶ 10; Closing Tr. at
43-44). Fees and costs are awarded here pursuant to a contract.
Under Pennsylvania law, pre-judgment interest is therefore
available. Melley v. Pioneer Bank, N.A., 834 A.2d 1191, 1204 (Pa.
Super. Ct. 2003) ("It is well settled that in contract cases, pre-
judgment interest is awardable as of right." (internal quotation
marks omitted)); Alleghany Energy Supply Co. v. Wolf Rub Mining
Co., __ A.3d __, 2012 WL 3265102, at *10 (Pa. Super. Ct. 2012)
(affirming award of prejudgment interest at the statutory rate of

50

6% in a contract case).  As of August 24, 2012, Bank of New York is entitled to prejudgment interest on the unpaid fees and costs in the amount of $130,150.23.  (3d Supp. Hennes Decl., ¶ 12 & Exh. 28).

<u>Conclusion</u>

For the foregoing reasons, I recommend that the reset rate of the Trust PIERS be set at 13.61% as of January 30, 2009, and that Bank of New York be awarded damages in the amount of $305,626,022 for the period between January 30, 2009 and June 1, 2012.  Interest will continue to accrue at a rate of 13.61% on a daily basis, and will compound on a quarterly basis, until it is paid to the Trust PIERS holders.  In addition, I recommend that Bank of New York be awarded costs and attorneys' fees in the amount of 3,160,012.31, as well as prejudgment interest on this award in the amount of $130,150.23.  Interest on the fee award will continue to accrue at a rate of 6% per annum until paid in full.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, Room 1320, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

*James C. Francis IV*
_____
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE.

Dated: New York, New York
      September 12, 2012

Copies mailed this date:

Douglas H. Flaum, Esq.
David B. Hennes, Esq.
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10004

Aaron T. Tucker
Fried, Frank, Harris, Shriver & Jacobson, LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004

Glenn E. Siegel, Esq.
Dechert, LLP
1095 Avenue of the Americas
New York, NY 10036-6797

James Osborne Moore, Esq.
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036

Alan J. Stone, Esq.
Douglas W. Henkin, Esq.
Kevin M. Ashby, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005